Opinion delivered March 20, 1888.

## No. 2475-5437.

## T. J. ADAMS ET AL. *v.* THE HOUSTON & TEXAS CENTRAL RAILWAY COMPANY.

1. SURVEY.—A survey made on the location of a land certificate can not be corrected by making a survey on entirely different land.
2. LOCATIONS.—When a block of surveys embracing many locations under certificates belonging to the same owner, is in partial conflict with land previously appropriated, the right to float and relocate all the certificates can find no sanction in law. Only so much of each location as may be in entire or partial conflict with older surveys can be floated.
3. GENERAL LAND OFFICE.—Neither the recognition of the Commissioner of the General Land Office of illegal surveys as valid corrected surveys, nor his permission to file them, can impart validity to them.
4. LAND CERTIFICATE—SURVEY.—Although the owner of a land certificate was mistaken in his initial point of survey, yet if he surveyed vacant land which he intended at the time to thus appropriate, such survey deprives him of the right afterwards to float his certificate and locate it on other land.
5. CONSTITUTION CONSTRUED.—Construing section 2 of article 14 of the Constitution, *held*, that however irregular or even illegal may have been the course of procedure which led to the issuance of a patent to land, when it is once issued the land covered by it is not subject to future location, such land being in contemplation of that section of the Constitution "titled."
6. SAME.—A survey of land made by virtue of a valid land certificate on vacant land, may be said to be "owned under color of title from the sovereignty of the State" by the person who owns the certificate by virtue of which the survey was made. But if the survey is made under a certificate which had already been located on other vacant land, of which survey had been made and returned to the general land office, the second survey made under the same certificate can not be regarded, under section 2, article 14 of the Constitution, as "equitably owned."

8. SAME.—Lands can not, when not patented, be "equitably owned" in contemplation of section 2, article 14 of the Constitution, when the surveys on the public domain by virtue of which alone they are claimed were made in violation of law.

9. STATUTE CONSTRUED.—Article 392, Revised Statutes, in so far as it embraces only that found in the second section of the act of April 25, 1871, must be construed as a continuation thereof and not as new enactment of the same. Each statute related to the same character of surveys, and such surveys as were protected and validated by the ac- of April 25, 1871, if on file in the general land office when that act was passed, are protected and validated by article 3921 Revised Statutes, if on file when the Revised Statutes were adopted.

10. LAND CERTIFICATES.—The statutes which declare that land certificates, when once located on unappropriated public domain shall not be floated, fix irrevocably the location of the certificate when once properly made, and forbids the acquisition of title from the State to any other part of the public domain.

11. LAND CERTIFICATES—SURVEYS.—A statute which in terms only professes to validate surveys can not be applied to validate illegal surveys, when it can be applied to surveys legal in every respect when made, but not returned in time prescribed by law.

12. SAME.—When a valid land certificate has been located on unappropriated public domain, and the land is properly surveyed, and the certificate returned to and filed in the general land office as required by law, the right to appropriate other land by the same certificate no longer exists. The owner of such certificate has then no power to aban-don his claim to the land thus located and surveyed, and thereby restore the certificate to its original force.

13. CONFLICT OF SURVEYS — LOCATIONS.— If locations and surveys were made in 1872 which covered lands not vacant at the time they were made, the owner of the certificate was entitled to a duplicate certificate, which might be located on unappropriated land.

14. SAME—If such owner was led into error by incorrect maps in the general land office as to the true position of the land thus held by prior right, his failure to take out a duplicate certificate should not prejudice his right to other land surveyed under the circumstances existing in this case, even though such certificate was in the general land office when the second survey was made. A mere irregularity in applying the certificates under such circumstances can not deprive such survey of the character of land "equitably owned under color of title from the sovereignty of the soil."

APPEAL from Travis. Tried below before the Hon. A. S. Walker.

*Leake & Henry*, for appellant: The land certificates of defendant having been once, by its first surveys, "located upon other land, and having been duly and legally surveyed, returned

to and filed in the general land office, with the field notes of such surveys," thereby became merged into said land, lost their quality and virtue as land certificates, and ceased to be personal property, or the evidence of a right to land, and could not afterwards have resumed their character of land certificates or become the instruments of acquiring other lands except by being lifted and floated in the manner and under the circumstances prescribed by law, and then returned to a surveyor, by whom alone they could have been appropriated to other land. (Sec. 3, art. 10, Constitution 1869; Rev. Stats., art. 3958; act June 2, 1879, sec. 5; Pas. Dig., art. 4575; act November 25, 1871, p. 41; Pas. Dig., art. 4574, 4301, 4302; Rev. Stats., art. 3810; Austin v. Dungan, 46 Texas, 244.)

No surveyor has authority to make new or entirely different surveys of public land without he is, in fact or in legal contemplation, in possession of a valid and unappropriated certificate, and a pretended survey made by him of entirely different land by virtue of a certificate then filed in the general land office with the field notes of other land, in all respects legally surveyed and returned to the general land office, and unlifted and unfloated, is an absolute nullity. (Act August 30, 1856; Bledsoe v. Cains, 10 Texas, 459; Pas. Dig., art. 4526.)

The appropriation of public land can not begin in the general land office, and the Commissioner of the General Land Office is but a ministerial officer, without authority to waive the performance of the precedent acts by which a land certificate becomes merged into land, or to confer title without their performance. (Pas. Dig., art. 4091; Pas. Dig., art. 4526; Austin v. Dungan, 46 Texas, 244; Commissioner of General Land Office v. Smith, 5 Texas, 479; Calvert v. Ramsey, 59 Texas, 491; Hanrick v. Cavanaugh, 60 Texas, 1; H. & T. C. Railway Company v. McGehee, 49 Texas, 482; Johnson v. Eldridge, 49 Texas, 524.)

A file, to be valid, must be made by virtue of a certain certificate which must remain in the hands of the surveyor, and must describe the land filed upon with sufficient accuracy to identify it from other land. (Lindsey v. Miller, 6 Peters, 675; Brush v. Ware, 15 Peters, 110; Weir v. VanBibber, 34 Texas, 229; Lewis v. Durst, 10 Texas, 415.)

Article 3921, Revised Statutes, affects only such surveys as had been made by valid and unappropriated certificates, and to such surveys as were made by virtue of certificates outside of

the general land office at the time the surveys were made, and being unlocated elsewhere, capable of being located on the land thus surveyed.

Article 3921 of the Revised Statutes is, as it appears in said statutes a continuation of the original act passed the twenty-ninth of April, 1871, and is not a re-enactment, and was not in force or applicable when defendant's surveys were made. (Rev. Stats., sec. 19, General Provisions; act April 25, 1871.)

*T. D. Cobbs,* for appellee.

[An argument is found among the papers of the cause by Mr. Cobbs, resisting appellant's motion for rehearing, but no brief in the case for appellee has reached the Reporter.]

STAYTON, CHIEF JUSTICE. · This is an action of trespass to try title, prosecuted by S. J. Adams, in his own right, and as executor of the last will of J. L. Leonard, to recover one hundred and five sections of land located and surveyed for them by valid alternate certificates owned by them. The appellee claims the land by virtue of surveys made for it prior to the time the locations and surveys were made for Adams & Leonard. The cause was tried without a jury and the conclusions of fact found show fully the nature of the controversy between the parties. The conclusions are as follows:

"1. The land certificates under which the plaintiff claims were issued October 10, 1879, to the Dallas & Wichita Railroad Company, and were, by the company, conveyed to Adams & Leonard. The plaintiff represents the ownership of Adams & Leonard.

2. The said certificates were regularly located June and July, 1880, upon the land sued for, surveys made January, 1881; field notes and certificates were returned to and filed in the land office in February, 1881. These field notes and certificates remain in the land office.

3. The plaintiff shows title sufficient to recover upon unless the land had been previously appropriated by the defendant by files, locations, surveys, etc., of which the plaintiff had notice before their locations were made.

4. July 1, 1872, certain land certificates were issued by the State to the defendant. Some of these certificates are the basis of the claim of the defendant to the land in controversy.

5. After the issuance of these certificates the defendant caused its agent to set about locating them. In so doing, the agent, Elgin, from the maps in the office of the surveyor of Jack Land District, ascertained the existence of a large body of vacant land, of irregular shape, and of area not well ascertained. This land was known in general direction to be west and northwest of the mouth of Miller's creek, a tributary falling into the Brazos on its right bank. This vacancy was pointed out by said agent to the surveyor of said land ·district for survey under, and by virtue of land certificates belonging to defendant, and then in the office of said surveyor, and the legal appropriation of said vacancy was attempted by locating thereon the certificates of the defendant. Partial surveys were made, and the agent, to secure the land from others, made files on August 5 and on November 28, 1872. These files were made in accordance with the map in the surveyor's office, taking them as correct. The files made November 28, do not call for each other, but were made upon calls on said map, which, had the map been correct, would have placed the files so as to form a connected block, and to include the vacancy sought to be appropriated, as was the intent of the defendant in making surveys and files. These were of eighteen certificates of six hundred and forty acres each, calling for a survey dependent for location upon the mouth of Miller's creek, one hundred and sixty-three certificates, thirty-nine, twenty-five and forty-seven —total, three hundred and twenty-eight certificates making a block. A file was made August 5, 1872, of seventy-five six hundred and forty acre certificates in a body, not connected with the later files, but dependent, also, upon said map for its locality.

Surveys were made (some before the date of the files, November 28), and in a block of surveys resembling in outline the apparent vacancy so ascertained and pointed out for location, by virtue of certificates of the defendant. (This block of surveys was west of the mouth of Muggins's creek, about ten miles southeast of the mouth or Miller's creek. There seems to have been a mistake, taking Muggins's creek for Miller's.) Field notes of these surveys were approved and recorded in the surveyor's office; and the field notes, together with the certificates by virtue of which the surveys were made, were returned to and filed in the land. office in October and November, 1872, and they still remain in the land office.

6. Subsequent to the return of these surveys and certificates of the land office, it became known in the land office and to the defendant that by reason of a mistake made as to connections and initial point of said surveys (shown to have been caused by want of correct maps and consequent inability to obtain proper calls) a part of them conflicted with land previously appropriated by other certificates and surveys. The extent of such conflict was not known until ascertained by an actual survey of the territory as noted hereafter.

7. Upon discovering that there was a mistake, as the surveys could not be placed on the land office maps, upon vacant lands, as shown in the land office, the defendant employed one Dennis Corwin, a skillful surveyor, to make an actual survey of the territory in which defendant was seeking to locate its certificates. Early in the year 1873, Corwin went upon the land and ascertained the metes and bounds of the vacancies sought to be appropriated.

8. When Corwin had ascertained the facts and had acquired the necessary knowledge of the true locality of the land the defendant was seeking to appropriate, he was appointed deputy surveyor of the land district in which the land was included, without having in his possession the certificates of the defendant (which were in the land office) or copies of them. Early in the year 1873 he proceeded to make surveys upon vacant public land (the same the defendant had attempted to file upon) in the name of said certificates of the defendant, which certificates, by mistake, had been surveyed upon other and located land. The surveyor made two surveys of six hundred and forty acres to each certificate—the certificates being what are called alternates. The field notes of these surveys bear date November and December, 1873, and they were approved and recorded in the surveyor's office, and they were returned to the land office in May, 1874, and were filed in June, 1874, in said office. These surveys were made upon vacant public land. The two surveys for each certificate were placed in a file with the appropriate certificate as belonging to it, the certificates first having been withdrawn from the field notes first returned. The surveys were examined and found correct, and were mapped upon the maps of the land office.

9. The said surveys made by Corwin were returned to and filed in the land office with the full understanding and consent of the Commissioner of the Land Office, given upon written ap-

plication of defendant. The surveys were called "corrected" surveys, but the nature of them, as being upon different land from the first surveys, was known and approved.

10. From 1873 the defendant paid taxes upon the said certificates as located lands, and has paid up to this date upon the land in controversy.

11. At the time of issuance of the certificates under which the plaintiffs claim, the surveys made by Corwin were mapped as located lands on the maps of the land office. Such was the condition of the maps at the adoption of the Constitution of 1876, and of the Revised Statutes, September 1, 1879, and at the subsequent dates of the issuance of the certificates and location of them, under which plaintiff claims.

12. The facts present the question whether these surveys, etc., made for the defendant, appropriated the lands so as to withdraw them from location at the date of plaintiff's files.

13. The field notes returned to the land office, made by Corwin, were in no sense "corrected field notes." Under the rules of the land office surveys are corrected by a re-survey, but limited to the land within the original survey so corrected.

14. These field notes were of original surveys made upon wholly different land from the first surveys. In some instances the second survey is distant ten or fifteen miles from the first survey under the same certificate.

15. The files made by defendant, if taken by their calls upon the surveys, called for upon the ground, did not cover the land sought to be appropriated. The files thus taken do not lie in a a compact shape, and they only include, in detached parts, about twenty-two sections of the land.

16. As before stated, Corwin, the deputy surveyor, did not have in his possession the certificates by virtue of which his field notes show them to have been made. They were at the time in the land office, and were applied to the surveys while in the office."

The conclusions of law were:

1. "That the land sued for, at the time of the location thereof by the said Adams & Leonard, was not vacant, unappropriated public land, the same having been appropriated by surveys previously made by virtue of valid certificates, evidenced in the land office.

2. That the surveys of the defendant applied to the certificates belonging to it (raised from surveys made by mistake upon located land, and transfered to the second set of field notes in June, 1874) were not void by reason of the fact that the certificates were not withdrawn from the land office and then returned with the new field notes to the land office. The irregularity in the surveys was cured by article 3921, Revised Statutes, September 1, 1879, before the inception of the claim of plaintiff. The surveys, etc., of the defendant upon the land in controversy are held to be valid.

3. Judgment will be rendered for the defendant."

The files or locations referred to in the findings of fact are as follows:

"JACKSBORO, TEXAS, November 28, 1872.
*To the Surveyor of Jack Land District:*
By virtue of eighteen (18) certificates issued to the Houston & Texas Central Railroad Company by the Commissioner of the General Land Office, on the first day of July, 1872, numbered from 29–2208 to 29–2225, I hereby file on the following vacant lands in your district:

Beginning 3,800 varas W. of survey No. 1, made for the Texas & New Orleans Railroad Company; thence west, south, east and north, so as to include thirty-six (36) sections.

[Signed]                    FRANCIS M. MADDOX,
                    Agent for the H. & T. C. R. R. Co."

"JACKSBORO, TEXAS, November 28, 1872.
*To the Surveyor of Jack Land District:*
By virtue of one hundred and sixty-three (163) certificates issued to the Houston & Texas Central Railroad Company by the Commissioner of the General Land Office, July 1, 1872, numbered from 28–1851 to 28–2013, I hereby file upon and enter the following vacant lands in your district, Knox and Haskell counties:

Beginning at the southeast corner of survey No. 1, made for the B. B., B. & C. R. R. Co., thence west, south, east and north, so as to include three hundred and twenty-six (326) sections.

[Signed]                    FRANCIS M. MADDOX,
                    Agent for the H. & T. C. R. R. Co."

"Jacksboro, Texas, November 28, 1872.
*To the Surveyor of the Jack Land District:*

By virtue of forty-seven (47) certificates issued to the Houston & Texas Central Railroad Company by the Commissioner of the General Land Office, July 1, 1872, numbered from 28–2040 to 28–2087, I hereby file on the following vacant lands in your district, in Young territory:

Beginning thirteen thousand three hundred varas south, nineteen thousand varas west of the southwest corner of survey number twenty-two, in Knox, made for the Columbus Tap Railroad Company; thence south twenty-eight thousand five hundred varas; thence north and east to the place of beginning so as to include ninety-four sections.

[Signed]                                     Frank M. Maddox,
                        Agent for the H. & T. C. R. R. Co."

"*To the Surveyor of Jack Land District:*

By virtue of seventy-five certificates issued to the Houston & Texas Central Railway Company by the Commissioner of the General Land Office. on the first day of July, 1872, numbered from 30–2501 to 30–2575, I hereby enter the following vacant land situated in Knox county:

Beginning on the west line of a file made for Thomas E. Haggard, at a point east of the north corner of survey number forty, block number three, Houston & Texas Central Railway Company; thence north to the north boundary line of Knox county; thence west ten miles; thence south and east for quantity.

                                            Robt. M. Elgin,
                        Land Agent, H. & T. C. R. R. Co."

August 5, 1872.

The case was tried largely on an agreed statement of facts, from which, in addition to the facts found by the court, it appears that none of the first surveys made by defendant (surveys made in 1872) embrace any part of the land claimed by and surveyed for the plaintiffs, and that in making the last surveys for defendant (surveys in 1873), entirely different and distinct land was surveyed under the certificates by virtue of which the first surveys were made, and that these last surveys do embrace a part of the land surveyed for the plaintiffs.

R. M. Elgin, a witness for the defendant testified that he was, at the time of the trial and when the files and first surveys

were made for the defendant, its agent or land commissioner, and had been formerly, for many years, chief clerk in the general land office of this State.

The residue of his testimony, set out in the brief of counsel, and found in all material points to be correct, is as follows:

"That previously to the making of the files and surveys for defendant, referred to in the evidence in this case, one Luckett had made a block of surveys for the Texas & New Orleans Railway Company, which he had called to commence on the Hines survey, which was an old survey, calling for the mouth of Miller's creek where it enters the Brazos river. That the situation of the Hines survey is determined alone by course and distance from the mouth of Miller's creek.

That Luckett, instead of going, as he intended, to the mouth of Miller's creek to begin his survey on the ground to find the Hines survey on the ground, actually went, instead to the mouth of Muggins's creek where it enters the Brazos river, about ten miles south and eight miles east of the point where Miller's creek enters the Brazos, and, believing he was at the mouth of Miller's creek, Luckett ran his lines on the ground to find the Hines survey as it would have been found from the mouth of Miller's creek, and believing he had thus found the Hines survey, he, from the point to where he believed it to have been found, made a block of surveys for the Texas & New Orleans Railroad Company, and returned the field notes to the general land office, where they were mapped as correct and as they would have appeared if the work had been done from the mouth of Miller's creek.

Afterwards a block of surveys was made, predicated upon this block, for the Buffalo Bayou, Brazos & Colorado Railroad Company, and the field notes for the surveys composing it were returned to and mapped in the general land office as correct.

The Houston & Texas Central Railway Company desired to appropriate the vacant land shown by the maps of the general land office to be left by these surveys, and made the files introduced in evidence for the purpose of doing so, predicated upon the maps of the surveys aforesaid for the Texas & New Orleans Railroad Company, and Buffalo Bayou, Brazos & Colorado Railroad Company, and had its surveys made on the ground predicated on the same errors.

That said surveys were returned to the land office with the certificates by virtue of which they were made and found to conflict in part with older surveys.

The files made for defendant in October, 1872, did not call for each other, but were made upon the maps in the land office, and if said maps had been correct, the files so made would have formed a connected block and included the vacancy sought to be appropriated.

That it being found by the maps of the general land office that there were conflicts and irregularities in that section of the State, impossible to reconcile without actual surveys were made on the ground, an expedition of surveyors, of whom Dennis Corwin was one, was sent out by the State for that purpose.

The result of the work done by this expedition was to show that Luckett had made the mistake above stated, and that while his work in fact connected with the mouth of Muggins's Creek, it called for connection with the mouth of Miller's Creek.

That said Dennis Corwin, while with said expedition, was a deputy to surveyor of Jack Land District, and when the character of the error on which defendant's first surveys were made, was ascertained, he made for the defendant other surveys, the ones now in controversy, for each of defendant's said certificates then on file in the land office as aforesaid, and afterwards by permission of the commissioner, as shown by certified copy in evidence in this case, the field notes so made by said Corwin were placed on file in the land office with said certificates.

Said Elgin further testified that only twenty-two of the certificates of defendant, embraced in the files, read in evidence by defendant, were afterwards located on the land in controversy, and that none of said certificates are now on the land in controversy.

That the defendant did not lift or float its certificates from the surveys first made or withdraw them from the general land office because he thought it had certain rights or equities growing out of its first files and surveys, which he did not choose to abandon or relinquish.

That the defendant got patents on several of these surveys, and got them on all that were called for. It was admitted that defendant has paid all taxes on said second surveys since their survey by it."

The application for permission to file field notes of surveys made by Dennis Corwin, with the commissioner's indorsement thereon, referred to in the evidence of Elgin, were as follows:

"AUSTIN, TEXAS, May 6, 1874.

*Hon. J. J. Groos, Commissioner General Land Office, Austin:*
SIR—I filed, or caused to be filed, in the surveyor's office of Jack Land District, during the year 1872, certain land certificates belonging to and issued to this road, which said files were based on surveys made and those connecting lines for the T. & N. O. R. R. and B. B., B. & C. R. R., as shown by the maps of your office.

That the said files were made in general, embracing certain tracts of country, that surveys were made by virtue of said certificates and field notes returned to your office, and the same indorsed correct on map.

Subsequently it was found that there was an error in the connecting lines of the old work, and I find that some of the surveys made by virtue of the following certificates are in conflict, viz: Nos. 28–1851 to 2085, 29–2208 to 2225, 31–2601 to 2850, 30–2351 to 2482.

I have caused a re-survey of some of the land embraced in the original files, and covered by the field notes, as mapped in your office.

I ask that I be allowed to return the same as corrected field notes, for the following reason: That the corrections do not embrace any new land, taking up only that covered by the original files, and now represented by the field notes in your office.

That there is no conflicting surveys on the land embraced in said files.

I hand you herewith copies of some of said files.
                    Your obedient servant,
                              ROBT. M. ELGIN,
                    Land Agent H. & T. C. R. R. Co.
                                   per Turnbull."

INDORSEMENTS.
"H. & T. C. R. R. Co., by Turnbull, applies to correct certain surveys and file corrected field notes.
Filed May 6, 1874.
                              J. J. GROOS.

Permission is hereby granted to correct surveys in conflict, as requested, and to return corrected field notes to this office in lieu of the original field notes.

J. J. GROOS, Commissioner."

The certificates described in the three files made on November 28, 1872, are shown to have been located on land other than that in controversy, by a file made on August 5, 1872, but whether the land covered by that file was vacant or whether any obstacle to its appropriation by the certificates existed is not made to appear.

That file embraced other certificates and covered one thousand square miles of land. The uncontroverted evidence shows that all the surveys, first made for the defendant, were made before the locations evidenced by the files, of date November 28, 1872, and that the certificates embraced in the file made on August 5, 1872, were never placed on any of the surveys made in 1873.

There can be no pretence that the surveys first made for the appellee were made in pursuance of the files or locations offered in evidence, for the surveys were made before the files of date November 28, 1872, were made.

If the file of seventy-five certificates, made on August 5, 1872, embraced any of the land in controversy, the same was evidently abandoned, for the record does not show that the first or second surveys made by the appellee were by virtue of any certificate recorded in the file of that date.

It is not claimed that the files of date November 28, 1872, covered the land in controversy; but from the fifteenth finding of fact it may be that these files did embrace about twenty-two sections of the land in controversy, but if this be true it is unimportant, because the witness Elgin expressly states that none of the certificates embraced in the files read in evidence are now in the lands in controversy.

It is thus seen that the appellee can claim no right under the files made, and recognizing that fact, its counsel states in his brief that "in this case the defendant relies on its actual surveys made by Dennis Corwin in 1873, and not upon its files. We must here call the attention of the court to the obstinacy with which the plaintiff's counsel persists in placing the claim of the defendant to the land on its files made in 1872 in the office of the surveyor of Jack land district. It was repeatedly

stated on the trial, and we here now repeat, that the files were not introduced to show title, but only to show an earnest and continued effort on the part of the Houston & Texas Central Railway Company to appropriate the vacant land which was finally identified and surveyed for it by Dennis Corwin."

It is not claimed that the surveys made for appellee in 1872 were not correctly made, nor that the files subsequently made would have authorized the survey of the land in controversy, but it is still contended that the surveys made in 1873 were essentially corrected surveys. This can not be true, and the court below correctly so held; for the second surveys made by virtue of the same certificates as were the first, embrace under each and all the certificates entirely different land. The idea is advanced that because some of the first surveys embraced lands already appropriated it was the right of the appellees to float and relocate all its certificates by virtue of which the first surveys were made. This finds no sanction in the laws of this State. The law must deal with each separate survey upon its own facts, and the fact that one person may make many contiguous surveys confers upon him no right to float certificates on which what is termed, in this case, a block of surveys had been made, simply because some of the surveys may in part or in whole conflict with older claims. The extent of the right of a person who has caused a location and single survey of land to be made on land in part appropriated by an older claim is to float or lift so much of the certificate as is in conflict. (Pas. Dig., 4574; Rev. Stat., 3898.) In such a case there is no right to float the entire certificate, and in view of the policy thus shown it certainly can not, with any show of reason, be claimed that the locator has the right to float the certificates from a large number of surveys, in block, simply because some of the surveys, or parts thereof, may be in conflict with older claims.

It is urged that the Commissioner of the General Land Office recognized the second surveys to be corrected surveys, and consented that they should be filed. Neither the recognition of the commissioner nor his permission to file could make the second surveys what they were not in fact.

The declaration made to the commissioner, after stating that some of the first surveys were in conflict, was: "I have caused a re-survey of some of the land embraced in the original files, and covered by the field notes, as mapped in your office." "I ask that I be allowed to return the same as corrected field notes

for the following reasons: That the corrections do not embrace any new land, taking up *only that covered by the original files,* and now represented by the field notes in your office." The first declaration was misleading and in part untrue, for the second surveys were not embraced in the original files nor covered by the field notes then in the land office. The second declaration was untrue in so far as it stated that the second surveys did "not embrace any new land, taking up only that covered by the original files."

It was further stated that there were "no conflicting surveys on the land embraced in said files," and from a reading of the entire application to file what were termed re-surveys or corrected surveys, the commissioner would have understood that there were conflicts between the surveys made under the different files made by the appellee, and that the first surveys were in fact made after files, and in an attempt actually to survey the lands covered by them. So doubtless understanding, the Commissioner said: "Permission is hereby granted to *correct surveys in conflict,* as requested, and to return corrected field notes to this office in lieu of the original field notes."

If the Commissioner had possessed the power to authorize the floating of all the certificates under which the surveys were made, and to authorize their location on other lands, it could not be held under the evidence that he ever did so. He, however, had no such power under the facts shown. It is urged that there was a mistake arising from a mistake formerly made by Luckett in making surveys for the Texas & New Orleans Railway Company, on which was based another mistake in making surveys for another railway company, all made before the appellee attempted to appropriate land, and that those mistakes were carried to the maps in the general land office, whereby the true position of the vacant land which the appellee desired to appropriate was shown to be at a place not covered by the files made by the appellee, if they be controlled by the points actually fixed on the ground and called for in the files; and that for this reason the appellee had the right to abandon the surveys first made and locate and have surveyed the land which would have been covered by its files had the maps in the general land office been correct. If the rights of the appellee depended on its files, there would be force in the proposition, but, as is conceded, this was not true.

From the evidence, the surveys for the Texas & New Orleans Railway Company, and for the Buffalo Bayou, Brazos & Colorado Railway Company had been fixed upon the ground before the surveys for appellee were made in 1872; and, although the true relation of these prior surveys to the mouth of Miller's creek, and the Hines survey may have been erroneously stated by mistake, yet they were made, existing as they did on the ground, the basis for the surveys made for the appellee. The surveys made for the appellee being the inception of its right to particular lands, they not being based on files previously made by it, there can be no pretense that from day to day as these surveys were made on the ground, the appellee did not intend by them to appropriate the lands covered by them. There could be no mistake as to the true locality of the lands thus actually surveyed on the ground, however great may have been the mistake as to their true relation to the mouth of Miller's creek or the Hines survey.

That the appellee would have caused its survey to begin at a different place had it known that the prior surveys were not situated, with reference to the mouth of Miller's creek or the Hines survey, as it supposed them to be, can not affect the question as to what land it actually did and intended to appropriate by its surveys actually made, nor confer upon it any right to float its certificates located on land actually vacant, and to locate them on other lands.

Since the act of August 30, 1856, the law has steadily declared that "it shall not be lawful for such surveyor to allow the holder of any land certificate or scrip, or other legal evidence of title to land, to lift or float the same after entry, location, file or survey, when the same is not made on land previously appropriated." (Pas. Dig., art. 4574; Rev. Stats., art. 3898.) The residue of the articles here cited determine the extent to which a locator may float his certificate, when the entry, file, location or survey covers in part land held by prior right, and limits to so much as is in conflict. What no officer of the government can give a locator permission to do, can not lawfully be done by him at his own will.

The certificates by virtue of which appellee caused surveys to be made were alternate certificates, under which the State, for the common school fund, became entitled to every alternate section located or surveyed on vacant land. The right to these attached at once when valid locations or surveys were made,

and this fact, in addition to the positive prohibition against floating certificates, furnishes another reason why the appellee had no right, if it attempted to do so, to abandon valid surveys.

The appellee not being entitled, by reason of any fact shown, to float the certificates by virtue of which it covered such of its first surveys as were made on vacant lands, two inquiries arise:

I.  Were appellants forbidden to locate the land at the time they did so by the provisions of article 14, section 2 of the Constitution. That provides "that all genuine land certificates heretofore or hereafter issued shall be located, surveyed or patented, only upon vacant and unappropriated public domain, and *not upon any land titled or equitably owned under color of title from the sovereignty of the State,* evidence of the appropriation of which is on the county records or in the general land office."

It appears from the evidence that the appellee has obtained patents on some of the lands in controversy, but whether this occurred before the appellant's made their locations or surveys, does not appear. So much of the lands, if any, as were patented before the appellants made their locations or surveys was not subject to appropriation by them, however irregular or even illegal may have been the several steps taken by the appellee which led to patent. Such lands were titled, and the appellants attempted appropriation of them forbidden by the Constitution; hence, they have no right whatever, to any of the lands so situated.

If, however, patents have been issued to appellee since appellants made their locations or surveys, the Constitution does not protect the lands so patented, any more than does it such of the lands as may be unpatented. The inquiry then arises, whether lands unpatented at the time appellants made locations or surveys can be deemed lands "equitably owned under color of title from the sovereignty of the State." If so, the locations and surveys of the appellants were forbidden by the Constitution, and confer no right.

Surveys of land made by virtue of valid land certificates on vacant land, may be said to be "owned under color of title from the sovereignty of the State," by the person who owns the certificates by virtue of which the surveys were made.

If, however, the surveys were made under certificates which had been already located on other vacant lands, of which surveys had been made and returned to the general land office, can it be held that the second surveys made under the same certificates are "equitably owned?" We are of the opinion that this must be answered in the negative.

We have already seen that such of the second surveys as were made for appellee under certificates by virtue of which such of the first surveys as were on vacant land were made, were made in violation of a positive statute, and it can not be held that equitable ownership can grow out of an act thus forbidden.

It was evidently intended, by the section of the Constitution referred to, to prohibit the location of land certificates on land lawfuly held by evidence of right inferior to a legal title, as well as to prohibit the location of such certificates on land titled; but it never could have been intended thereby to protect from location such lands, not titled, as persons had attempted to appropriate in clear violation of a plain statute, as well as the policy indicated by the whole tenor of the statutes and constitutional provision applicable to the acquisition of title to public and unappropriated lands.

The location and survey of land by virtue of a land certificate already lawfully appropriated to other land, may, in a general sense, be said to give color of title under the sovereignty of the State; but, under the terms of the Constitution, such color of title is not made sufficient to forbid the location of the land by another person by virtue of a genuine land certificate.

It must be not only claimed under such color of title, but the facts which give color of title must also give equitable ownership, or the provision of the Constitution does not give protection.

II. Were the second surveys made by virtue of the same land certificates which by the first surveys were located on vacant land validated, as claimed by the appellee, and found by the court, by Revised Statutes, article 3921? That article declares that "all surveys properly made by virtue of genuine or valid land certificates—which surveys, together with the certificates by virtue of which they were made, have been returned and are now on file in the general land office, or were so on file on the twenty-fifth of April, 1871, and not in conflict with any other valid land claim—shall be deemed valid, and the Commis-

sioner of the General Land Office is hereby authorized and required to issue patents for the same." This article is carried into the Revised Statutes from the act of April 25, 1871 (Pas. Dig., art. 7089), but as the article now stands the words, "or were so on file on the twenty-fifth of April, 1871," have been added to the second section of the former law. The purpose intended to be accomplished by these added words was evidently to give to such surveys as were contemplated by the act of April 25, 1871, and were on file in the general land office at the time the Revised Statutes were adopted, just such protection as was given by the act of April 25, 1871, to surveys on file at the time that act was passed. A further purpose had in view in carrying into the Revised Statutes the second section of the act of April 25, 1871, was to keep in force so much of that act, and thus protect such surveys as were contemplated by it.

Article 3921, Revised Statutes, in so far as it embraces only that found in the second section of the act of April 25, 1871, must be considered "and construed as a continuation thereof, and not as a new enactment of the same." (Final title, Rev. Stats., sec. 19.) Article 3921, Revised Statutes, has application to the same character of surveys, and bears towards them the same purpose and spirit as did the act of April 25, 1871. Such surveys as were protected or validated by the act of April 25, 1871, if on file in the general land office when that act was passed, are protected or validated by Article 3921, Revised Statutes, if on file when the Revised Statutes were adopted.

The true construction of article 3921 it becomes necessary to consider, and relating as it does to the act of April 25, 1871, we may properly look to that act, in fact must do so, to ascertain the legislative intention. The title of that act was, "An act in reference to the location, survey and return of genuine land certificates," and the entire act was as follows:

1. "No rights held by any individual or corporation, by virtue of a genuine land certificate, shall be considered forfeited by reason of its failue to have been located, or surveyed, or returned, since the second day of March, 1861, under any law heretofore passed limiting the time for such location or survey, and the time for the location, survey and return to the general land office of all such certificates, shall be extended to the first day of January, A. D. 1875; provided, this act shall not vali-

date any land certificates issued to any railroad company that have been declared void by competent authority.

2. All surveys properly made by virtue of genuine and valid land certificates, which surveys, together with the certificates by virtue of which they were made, have been returned and are now on file in the general land office, and not in conflict with any other valid land claim, shall be deemed valid, and the Commissioner of the General Land Office is hereby authorized and required to issue patents for the same." (Paschal's Digest, arts. 7088, 7089.)

The rule that "in all interpretations the court shall look dilligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy" was expressly enacted by the Legislature in adopting the Revised Statutes, and it thus becomes peculiarly proper that it should be applied in interpreting any of its provisions.

When we look to the title of the act of April 25, 1871, and to the language of the act itself, we at once perceive that it was intended to apply to matters in reference to which there were existing laws, which it was thought might, if applied to facts transpiring during and even after the close of the war in which the country had been engaged, operate harshly.

The act of February 10, 1852, provided that "the field notes of all surveys hereafter made, shall be returned to and filed in the general land office within twelve months from the date of survey."

"All lands heretofore located by virtue of any genuine claim to land, shall be surveyed within twelve months from the passage of this act, and all lands which may be hereafter located, shall be surveyed within twelve months from the date of location, or the said locations in either case shall be null and void, and the lands be subject to relocation and survey as other vacant and unappropriated land." (Paschal's Digest, arts. 4566, 4568.)

These statutes were in force when the act of April 25, 1871, was passed, as to all locations and surveys, not withdrawn, for a time, from their operation by the act of December 14, 1863, the act of November 2, 1866, and perhaps some others intended to meet particular cases.

So stood the old law as to the time within which surveys must be made and returned. Prior to the adoption of the Constitu-

tion of 1869 we know of no law which prescribed a period within which claims for land were required to be located, except such claims for land as were issued to railway companies. (Pas. Dig., arts. 4949, 4960, 4964.)

The first section of the act of April 25, 1871, evidences the fact that the Legislature thought it would be an evil to apply the act of February 10, 1852, to surveys and returns, which, under that act, must have been sooner made, under locations made between March 2, 1861, and the passage of the act of December 14, 1863, or between the time limited by the act of November 2, 1866, and the passage of the act in question, or to apply any law requiring locations to be made within given periods to the times intervening the periods before mentioned. The act recognizes the fact that "under *laws heretofore passed limiting the time* for such location or survey," forfeitures of rights once existing would ensue if the act was not passed. It recognized that a failure to locate *within the time limited* would work a forfeiture of the right to locate at all; that a failure to survey *within the time* limited after location, would forfeit the right to survey; that the failure to return the survey to the general land office *within the time limited* would forfeit the right to return. A law to relieve from forfeiture a right once existing necessarily implies that a right was once conferred by law or recognized by it, and we know of no rule of construction by which such a law can be made to confer a right never before existing.

The first section of the act, in terms, waived the forfeitures in cases in which locations, surveys and returns had not been made, and it gave a further period within which these acts might be done. This, however, was probably thought not to reach the entire evil intended to be remedied, for doubtless many surveys had been returned to the general land office between March 2, 1861, and the passage of the act, but not within the time prescribed by the act of February 10, 1852, and the second section of the act was doubtless intended to save from forfeiture surveys so returned. How far the act could be given effect, when considered in the light of the declaration contained in section 2, article 10, of the Constitution of 1869, it is not now necessary to consider, for the act could legally have application to surveys made before the adoption of that Constitution, and not forfeited by it, but returned subsequent to its adoption, but not within the time prescribed by the act of February 10, 1852, as might it be held to apply to cases covered by

the acts of December 14, 1863, and November 2, 1866, as well as to surveys made between the adoption of that Constitution and the passage of the act of April 25, 1871.

The title of the act, as well as its body, shows that its purpose and spirit was to preserve rights which were or might have been legally acquired under the laws regulating the locations, surveys and returns under valid land certificates, but there is nothing in it that evidences an intention to validate a location, survey or return, which would not have been valid under such laws if done within the time and in the manner prescribed by them.

Having, as we have felt bound to do, considered the act of which article 3921, Revised Statutes, is in part but the continuation, we will briefly consider the language of the article itself, disassociated with the former law, in the light of the laws affecting the subject to which it is claimed to relate, as they have existed since the act of August 30, 1856 (Pas. Dig., art. 4574; Rev. Stats., art. 3898).

The laws last referred to forbid the floating of land certificates when once located on vacant and unappropriated public domain. It is claimed that article 3921, Revised Statutes, validates "all surveys" which, together with the certificates by virtue of which they were made, were on file in the general land office at the time the Revised Statutes were adopted.

It is evident that the Legislature did not intend to validate "all surveys" that had been returned to and were on file in the general land office at the time the Revised Statutes were adopted, although persons may have assumed to make and return them by virtue of genuine or valid land certificates that would at one time have authorized the appropriation of the quantity of vacant public domain covered by them. It would not be contended that a person having on file in the general land office at the time the statute in question was passed a survey made under claim of right to land, by virtue of a land certificate on which a valid patent existed, covering the entire quantity of land authorized to be appropriated by the certificate, could be heard to claim that the statute validated such a survey; for the effect of such a holding would be to enable a person, through the statute, to acquire under and by virtue of a certificate, double the quantity of land authorized to be appropriated under the right evidenced by the certificate.

To this proposition it doubtless would be replied that a patent for all the land authorized to be appropriated by virtue of a certificate, if valid, takes from the certificate all virtue, capacity or power by which through it other land may be acquired. The correctness and conclusiveness of the answer can not be denied; but on it the inquiry arises, who is to determine when or under what circumstances a land certificate shall cease to confer on its owner the right to acquire another tract of land through it, after, by the act of its owner, it has been applied to sufficient land subject to appropriation by it to exhaust the owner's claim. This must rest with the Legislature which would have power, unless restricted by the Constitution, to permit a valid patent to be canceled and other land to be acquired by virtue of the certificate on which it was issued. The mere will of the owner of a land certificate can not impart to it a power which the law denies. In the case before us there can be no question but that the surveys made for the appellee in 1872, on land then unappropriated, which, with the certificates, by virtue of which they were made were returned within proper time were in all respects valid.

Did these acts tie the certificates to these lands? It seems to us that the statutes which declared that certificates when located on unappropriated public domain should not be floated accomplished this. This was the will of the Legislature. Can it be made to yield to the will of the individual and thus that became legal which the statute forbids. If the statute in question has any application to the first or last surveys made by the appellee, which, with the certificates under which they were all made were on file in the general land office when the Revised Statutes were adopted, does it apply to both sets of surveys? If not, to which and why to the one rather than the other? It will not be contended that the statute applies to both sets of surveys; for the statute makes the surveys to which it does apply valid and requires the Commissioner of the General Land Office to patent them, which would give to the appellee twice the qantity of land, under each certificate, that the State promised or the appellee was entitled to receive. If we give the language of the statute a literal construction, and hold that surveys were "properly made by virtue of genuine or valid land certificates" when made in violation of law under certificates already appropriated to lands subject to appropriation by them which had been surveyed and with the certificates returned to

and filed in the general land office, we could not escape holding that the statute. validated both sets of surveys and required them to be patented. The statute then does not apply to "all surveys" that were on file in the general land office at the time of its passage.

The surveys made in 1872 on unappropriated lands, and with the certificates returned to and filed in the general land office, did not need any act to make them valid. They were valid without the aid of any curative legislation, and the mandate of the laws to the Commissioner of the General Land Office was to issue patents on them. (Pas. Dig., art. 4286; Rev. Stat., art. 3953.)

As said in Simpson v. Chapman, 45 Texas, 566, "the certificate, until located, as has been often said by this court, is personalty and may be assigned and transferred by parol. But when it is located, it loses this character. It then attaches to the land, and becomes a chattel real, and can be assigned and transferred by parol no more than the land itself. Instead of being merely property of itself, it is like a deed, the evidence of title to the land upon which it is located." As said in Hearne v. Gillett, 62 Texas, 25, "After such a certificate has been located it can no longer be considered as personalty, but is then merged into, and becomes part of the realty. · * * By the express terms of the statute the *location* and *survey* of a valid land certificate constitutes such color of title as will support the defense of three years limitation, and such title as will authorize the maintenance of the action of trespass to try title."

Could the appellee decline to receive title to the lands lawfully located, surveyed and returned, and insist upon its right to abandon them and have other lands under the same certificates? We know of no law that would permit this, there being no obstacle or objection to patent, and if it could be done, this right to do so must rest in the inherent right of the owner of a certificate to float it, after location, survey and return, notwithing the letter and spirit of the law forbids the doing of this. No such inherent right existed, and, as to this matter, as all others, the will of the Legislature must be given effect.

The testimony of the agent of the appellee, however, shows clearly that the appellee did not intend to lift or float its certificates, or to abandon rights acquired through the locations and surveys made in 1872 and returned within the time prescribed

by law. His statement was: "The defendant did not lift or float its certificates from the surveys first made, or withdraw them from the general land office, because he thought it had certain rights or equities growing out of first files and surveys, which he did not choose to abandon or relinquish."

If the statute in question has any application to the facts of this case, must it be applied to the surveys that were clearly lawful under the letter and spirit of all the laws relating to the subject, or may it be applied to the surveys made in violation of law when its letter does not so require? The first inquiry, we are of opinion, must be answered affirmatively, and the latter must be denied.

We are of the opinion, however, that the statute invoked by the appellee has no application to the facts presented. Such surveys as were within the contemplation of the statute must have been "properly made by virtue of genuine or valid land certificates." The words "properly made" doubtless may apply to the mathematical correctness with which lands embraced in surveys returned are delineated, but they are as aptly applied to the legality of surveys—to the legal right of a survey to appropriate the land covered by it. This would depend on the nature of the certificate at the time the survey was made, for if it was not made by authority of a valid then existing claim on the unappropriated public domain, accuracy of survey could not impart to it validity.

The word "virtue" in the connection used evidently means "capacity or power adequate to the production of a given effect." (Webster.) The effect intended was the acquisition of parts of the public domain, and this could not be attained, however accurately a survey may have been made, unless, at the time, the certificate gave to its owner the right and power to acquire such land. If its land acquiring capacity or power, once existing, had been exhausted, its virtue as a genuine or valid land certificate was gone, except in so far as this existed to authorize the completion of title to land with the inception of which the certificate's further power over unappropriated public domain ceased to exist.

By "genuine land certificates" we understand to be meant such certificates as were issued to persons or tribunals clothed with lawful power to issue them, as evidence of right to land; but it is not enough that a survey may have been accurately made and returned to the general land office under claim of

right to do so made under a genuine land certificate. A survey, to be protected, must have been made by the virtue or power originally conferred by a genuine land certificate, unimpaired or destroyed by the fact that under it all the land authorized to be appropriated by it had been appropriated. By "valid land certificate" we understand to be meant, when used in the connection found in the statute, a certificate having such strength or force under the law as will entitle its owner through it to appropriate a part of the unappropriated public domain. When it has ceased to have this, by the fact that all the land authorized to be appropriated by virtue of it has thus been appropriated, then it ceases to be a certificate by virtue of which a further survey or appropriation may be properly made.

We do not wish to be understood to hold that a certificate once located can never afterward give right and power to appropriate other lands, when the location becomes ineffective by failure to survey and return when the statute simply provides that on such failure the land shall return to the mass of unappropriated public domain; but to hold that a law which, in terms, only professes to validate surveys, can not be applied to validate illegal surveys when it can be applied to surveys legal in every respect when made, but not returned within the time prescribed by law.

We desire to be understood further to hold, when a valid land certificate has been located on unappropriated public domain, the land located by it properly surveyed, and this with the certificate returned to and filed in the general land office, as required by law, that the right to appropriate other land by the same certificate no longer exists.

That in such case, without legislative permission, the owner of the certificate has no power or right to abandon his claim to the land thus appropriated, and thereby restore to the certificate its original force.

It may be that some of the lands located by the appellants prior to such locations had been patented to the appellee under its surveys made in 1873, on certificates then in the general land office, under which some of its surveys were made in 1872, and if so the lands so patented were not subject to location by appellants, being "land titled."

In so far as surveys made for appellee in 1872 covered lands not vacant at the time they were made, the appellee was entitled to duplicates of the certificates under which the surveys so

in conflict were made, and those duplicates might have been located on the lands in controversy.

The appellee being entitled to other lands by virtue of such certificates as were located on land covered by prior right, and there being every reason to believe that it was led into a mistake as to the true position of the lands held by prior right by the incorrect maps in the general land office, we are of the opinion that the failure to take out duplicates of such certificates ought not to prejudice the right of the appellee to such lands as may have been surveyed under certificates in conflict, even though such certificates were in the land office at the time the second surveys were made. By virtue of the certificates, so situated, the appellee was entitled to land, and we are of the opinion that a mere irregularity in applying them to second surveys will not deprive them of the character of land "equitably owned under color of title from the sovereignty of the State." Lands so owned not being subject to location, appellants have no right to them.

Such surveys, however, as were made for the appellee in 1873, under certificates by virtue of which it had caused surveys to be made in 1872 on unappropriated public domain, were invalid and interposed no obstacle to the acquisition of such lands by the appellants.

These conditions will lead to the reversal of the judgment, and if the appellee has further right than here indicated it is not shown by the record before us.

It is impossible, however, for this court, on the record before it, to render a judgment definitely adjusting the rights of the parties, and for this reason the judgment of the court below will be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered March 16, 1886.

Associate Justice Walker did not sit in this case.