no good purpose can be served by further discussion here.

The judgment of the Court of Civil Appeals, which reverses the judgment of the district court and renders judgment for the receiver, is affirmed.

### STARK et al. v. CHAISON et al.
### No. 1308—5808.

Commission of Appeals of Texas, Section B.
June 1, 1932.

E. J. Fountain, Jr., Andrews, Streetman, Logue & Mobley, and Fred L. Williams, all of Houston, George E. Holland and L. J. Benckenstein, both of Beaumont, Monroe Chapman, of Orange, and Ben H. Powell and J. A. Rauhut, both of Austin, for plaintiffs in error.

Oliver J. Todd, Jack M. Moore, and Todd & Pipkin, all of Beaumont, J. T. Adams, of Orange, and George Sergeant, of Dallas, for defendants in error.

SHORT, P. J.

This is a suit in trespass to try title involving chiefly, though not entirely, the title and possession of a certain tract of land located in Orange county, Tex., described as 640 acres of land in patent No. 397, vol. 41, issued by T. M. Campbell, Governor of the state of Texas, November 19, 1910, to E. W. Brown and W. H. Stark, assignees of W. B. Wortham, their heirs and assigns, by virtue of certificate No. 689, issued to Lizzie Higginbotham. The plaintiffs in error claim under this patent. The defendants in error, who are the heirs of Charles Baldwin, deceased, claim the same 640 acres of land, besides some additional quantity amounting to about 115 acres, to the extent of three-fourths of an interest, by virtue of the ownership, to the extent of the interest claimed, in a certain land certificate

for a league issued to G. B. Brownrigg, No. 147, dated January 20, 1860, issued by Clement R. Johns, comptroller, under authority of a special act of the Legislature. The ownership of Charles Baldwin, to the extent of three-fourths of the interest in this certificate, when the land in controversy was surveyed by virtue of it, appears to be unquestioned. The case was tried in the district court of Orange county to a jury, which answered the only special issue submitted, in favor of the plaintiffs in error, and judgment was entered accordingly, but the Court of Civil Appeals of the Ninth District, upon appeal to that court, reversed the judgment of the district court, and rendered a judgment in favor of the defendants in error, and against the claimants under the patent above mentioned. There was a judgment also against certain warrantors, but the details of this portion of the judgment need not be further mentioned. 29 S.W. (2d) 500, 505. The case has reached the Supreme Court in the usual way, and a submission of it has been had before Section B of the Commission of Appeals.

The record shows the following undisputed facts:

(1) By special act of the Legislature, approved January 20, 1860, the certificate for one league of land was awarded to G. B. Brownrigg. (2) On January 20, 1860, C. R. Johns, comptroller, issued certificate No. 147 to G. B. Brownrigg for 4,428 acres of land. On the face of the certificate is written: "Copy of certificate floated in lieu of the original for re-location. January 7, 1874. Delivered to Wm. F. Clark. Jacob F. Kuechler, Commissioner." This certificate was filed in the land office August 11, 1860. On the back of the certificate is a transfer of one half thereof to Charles Baldwin, dated January 21, 1860. (3) Brownrigg conveyed the other half of this certificate to his three daughters, naming them. Defendants in error established the fact that Charles Baldwin acquired a three-fourths undivided interest in this certificate, and, as the heirs of Charles Baldwin, they inherited this interest, while the remaining one-fourth undivided interest is shown to have been the property of E. E. Chubbuck. (4) On December 27, 1860, "Baldwin & Chubbuck, per Chubbuck, wrote Joshua Harmon, requesting a survey of the land involved under the certificate in Orange county, and on January 8, 1863, A. H. Reading, district surveyor, made the survey, the field notes of which were returned to the general land office on January 20, 1864. (5) By power of attorney dated December 1, 1873, Edwin E. Chubbuck authorized Wm. F. Clark of Travis county, Tex., to withdraw the certificate for the purpose of proving the transfer from Brownrigg to Baldwin, and to apply for and obtain a certificate in lieu thereof, by the process then known as "floating," and to locate same, and obtain pat-

ents. By virtue of another written power of attorney, undated but acknowledged December 12, 1873, E. E. Chubbuck authorized Wm. F. Clark to bargain, sell, release, and convey the certificate. (6) By a deed dated April 15, 1874, Clark, as attorney in fact for Charles Baldwin and E. E. Chubbuck, conveyed the certificate to John W. Lawrence and by deed dated April 15, 1874, John W. Lawrence conveyed the certificate to Wm. D. Hoskins and S. W. Allen. A league of land in Brazoria county was thereupon patented to Hoskins and Allen. However, it further appears that by virtue of this certificate a tract of 777 acres was surveyed on July 17, 1860, and the field notes were filed in the general land office on August 11, 1860, and another tract of land of 328 acres was surveyed on the same date, and field notes returned to the general land office on August 11, 1860, and the third tract of approximately 1,117 acres was surveyed on July 18, 1860, and the field notes filed in the general land office on August 11, 1860, all located in Liberty county, while a tract of 755 acres was surveyed January 8, 1863, and the field notes filed in the general land office on January 20, 1864; and another tract of approximately 1,454 acres was surveyed January 12, 1863, and the field notes filed in the general land office on January 20, 1864, located in Orange county. The following instrument appears in file 77, Brazoria 1st Class, June 5, 1874:

"No. 147                          4428 Acres.
    "Austin, Texas, January 20, 1860.

"This is to certify that Geo. B. Brownrigg is entitled to have surveyed by any legally authorized surveyor upon any of the vacant and unappropriated Public Domain of the State of Texas, one League of land, to which the said George B. Brownrigg is entitled as a Headright. In accordance with this provision of 'An Act entitled an act for the relief of G. B. Brownrigg, approved January 20, 1860.'

"In testimony whereof, I hereunto set my hand and affix the impress of the seal of said office the day first above written.
        "Clement R. Johns, Comptroller."

Across the face of the foregoing is the following:

            "General Land Office,
            "Austin, January 17, 1874.

"Patent will issue upon this certificate to Charles Baldwin and Edward E. Chubbuck, assignees of George B. Brownrigg, or to the assignees of the said Baldwin and Chubbuck. A complete chain of title is on file in this office from Brownrigg to Baldwin and Chubbuck.
            "Jacob Kuechler, Com.
"1 League Patented
"Oct. 13, 1874.
    "J. J. Groos, Com."

At the bottom thereof is the following:

"General Land Office,
"Austin, Texas, January 6, 1874.

"I, Jacob Kuechler, Commissioner of the General Land Office of the State of Texas, do hereby certify that the annexed is a correct and true copy of the original certificate on file in this office, and that the field notes of 5 surveys located in Liberty and Orange counties, made by virtue of the aforesaid certificate, have been returned to his office, and having been found to conflict with other surveys that this copy is floated in lieu of the original certificate, for re-location, but without any prejudice to the rights of any person by virtue of such certificate, in accordance with an act, entitled "An Act to better protect the pa ers, records and files in the General Land Office.' Approved June 2, 1873.

"In testimony whereof I hereunto set my hand and affix the impress of the seal of said office the day and the date above written.

"Jacob Kuechler, Commissioner."

(7) On January 20, 1874, a receipt of the copy of the certificate was acknowledged by Wm. F. Clark, as attorney in fact for Charles Baldwin and E. E. Chubbuck; the copy being delivered to Clark by the commissioner of the general land office. On October 13, 1874, a patent was issued on this certificate for a league of land in Brazoria county to William D. Hoskins and S. W. Allen as assignees of G. B. Brownrigg. (8) On August 30, 1881, W. C. Walsh, commissioner, issued to Lizzie Higginbotham a certificate for 1,280 acres No. 689, and designated as Confederate scrip. The plaintiffs in error claim the 640 acres of land described in the patent, above mentioned, under the appropriation allotted to the school fund out of this certificate.

The plaintiffs in error purchased for value, and, as claimed by them, without notice, the land under a claim originating with the issuance of the Higginbotham certificate. The plaintiffs in error also claim title under the three and five year statute of limitation, and the jury found that this claim was sustained by the evidence. However, the Court of Civil Appeals concluded that there was no evidence upon which to base this finding of the jury, and we are of the opinion the judgment of the Court of Civil Appeals was correct in this particular. Upon the conclusion of the testimony, both sides asked for an instructed verdict, which was refused. While the Court of Civil Appeals reversed the judgment of the district court, and rendered a judgment for the defendants in error for all the land sued for, it stated, among other things the following: "While it is true the land was surveyed in 1863 and Baldwin did not die until 1874 and neither he, in his lifetime, nor his heirs, since his death, ever claimed this land or paid any taxes thereon or exercised any domain whatever over it, their nonclaim, until shortly before this suit was filed, being as complete

as if they had no interest therein, the presumption of a power of attorney under which Clark could have lawfully sold the land was not established as a matter of law."

The facts are undisputed which are material to a decision of the case. These facts show that the Court of Civil Appeals sustained the location in Orange county made under certificate No. 147, where the field notes of the survey were not returned as required by the Act of February 10, 1852 (3 Gammel's Laws, p. 936), and held invalid the patent issued by Governor T. M. Campbell, by virtue of the proceedings had in the location of the Higginbotham certificate No. 689. The conclusion reached by the Court of Civil Appeals is assailed by proper assignments of error duly presented in the application. The plaintiffs in error present under their several assignments the following propositions: (1) It appearing that the field notes under which the defendants in error claim their right to recover the land in controversy were not returned to the land office within twelve months after the survey, as required by law, the location of the certificate upon the land was a futile one, and gave no vested right in the land to the attempted locators; (2) that one who in good faith for value and without notice purchases an equitable interest in property, and afterwards acquires a legal title to same, is entitled to protection as against a prior equity; (3) that, since each and all of those holding under the Higginbotham title had no notice of the claim asserted by the defendants in error and paid value for the land, judgment was properly entered for them to the extent of the Higginbotham survey; (4) that the Act of June 2, 1873 (7 Gammel's Laws, p. 632), expressly permitted the floating of the Brownrigg certificate, and, since the act of floating here commenced at least on December 1, 1873, prior to Baldwin's death, which occurred on February 18, 1874, the defendants in error, in any event, cannot now claim to have acquired a vested interest in the land by virtue of the location attempted to be made on January 8, 1863.

In order to reach a proper disposition of the issues of law applicable to the facts in this case, it is necessary to review in the light of the facts (1) the Act of February 10, 1852 (3 Gammel's Laws, p. 936); (2) the Act of December 14, 1863 (5 Gammel's Laws, p. 671); (3) the Act of November 2, 1866 (5 Gammel's Laws, p. 999); (4) the Act of April 25, 1871 (6 Gammel's Laws, p. 962); (5) the Act of November 29, 1871 (Acts 1871, 2d Sess., c. 57); (6) the Act of June 2, 1873 (7 Gammel's Laws, p. 632); (7) article 10, section 2, of the Constitution of 1869; (8) section 18, article 16, of the Constitution of 1876; and to discuss some of the opinions of the Supreme Court relative to these and kindred matters.

A land certificate is merely the obligation of the government entitling the owner of it to secure the designated quantity of land by following the requirements of the law. N. Y. & Texas Land Co. v. Thomson, 83 Tex. 169, 17 S. W. 920. The Act of February 10, 1852 (Paschal's Dig. arts. 4566, 4568), provided as follows: "The field notes of all surveys hereafter made, shall be returned to, and filed in the General Land Office within (twelve months) from the date of survey. * * * All lands heretofore located by virtue of any genuine claim to land, shall be surveyed within twelve months from the passage of this act, and all lands which may be hereafter located shall be surveyed within twelve months from the date of location, or the said locations, in either case, shall be null and void, and the lands be subject to re-location and survey, as other vacant and unappropriated land."

The facts show that the land described in the T. M. Campbell patent, covering 640 acres, and 115 acres not so covered, was surveyed at the request of "Baldwin & Chubbuck, per Chubbuck," on January 8, 1863, and that the field notes were not returned to the general land office until January 20, 1864, which was twelve days after the expiration of the twelve months from the date when the survey was made, and, under the express provisions of the Act of February 10, 1852, the location of the Brownrigg certificate became ineffective to create a vested right to the land in the owners of the certificate by virtue of that location.

Section 2, article 10, of the Constitution of 1869, reads as follows: "That the residue of the public lands may be ascertained, it is declared that all surveys of land heretofore made, and not returned to the general land-office, in accordance with the provisions of an act entitled 'An act concerning surveys of land,' approved 10th February, 1852, are hereby declared null and void."

Section 18, article 16, of the Constitution of 1876, provides that: "The rights of property and of action, which have been acquired under the constitution and laws of the republic and State, shall not be divested; nor shall any rights or actions which have been divested, barred, or declared null and void by the constitution of the republic and State, be reinvested, renewed, or reinstated by this constitution; but the same shall remain precisely in the situation which they were before the adoption of this constitution, unless otherwise herein provided: And provided further, That no cause of action heretofore barred shall be revived."

In Frederick v. Hamilton, 38 Tex. 321, the Supreme Court said: "The act of the tenth of February, 1852, provided that 'All lands heretofore located by virtue of any genuine claim to land shall be surveyed within twelve months from the passage of this act, or the location shall become null and void, and the lands subject to re-location and survey, as other vacant and unappropriated land.' The same act provides that the field notes of all surveys shall be returned to the General Land Office within the same time. We are of the opinion that the location of appellant comes strictly within the object and purview of the act cited, and that Horton was bound by that act to have his survey and field notes returned to the General Land Office within the time prescribed, or lose the benefit of his location. He has failed to make any return as required, and the appellee, or his vendor, having made the location on the same land, and having complied with the statute, has received a patent for the land, and we are unable to discover any legal grounds for depriving him of the fruits of his industry and diligence. (Upshur v. Pace, 15 Tex. 531; Patrick v. Nance, 26 Tex. 298; Crow v. Reed. 25 Tex. Supp. 392.)"

And in the case of N. Y. & Texas Land Company v. Thomson, 83 Tex. 169, 17 S. W. 920, 923, the Supreme Court, among other things, said: "One requirement of the law is that the field-notes shall be returned with the certificate to the land-office within 12 months after the survey. If this is not done, the location is void, and a subsequent locator may appropriate the land. * * * The survey would become void, with nothing to support it, and any one might show its nullity in any proceeding." Holloway v. Holloway, 30 Tex. 177; House v. Talbot, 51 Tex. 468; Cassin v. O'Sullivan, 61 Tex. 595; Snider v. Methvin, 60 Tex. 500; Tucker v. Murphy, 66 Tex. 355, 1 S. W. 76; Garza v. Cassin, 72 Tex. 440, 10 S. W. 539.

The Supreme Court in Jones v. Lee, 86 Tex. 35, 22 S. W. 386, 391, 1092, discussed section 2, article 10, of the Constitution of 1869, and section 18 of article 16 of the Constitution of 1876, as follows:

"The second section of article 10 of the constitution of 1869 declared that 'all surveys of land heretofore made, and not returned to the general land office, in accordance with the provisions of an act entitled "An act concerning surveys of land," approved 10th February, 1852, are hereby declared null and void.'

"Section 18 of article 16 of the constitution of 1876 provides that no 'rights or actions which have been divested, barred, or declared null and void by the constitution of the republic and state be reinvested, renewed, or reinstated by this constitution; but the same shall remain precisely in the situation in which they were before the adoption of this constitution, unless otherwise herein provided.'

"Thus, we find that by clear and emphatic provisions of the statute, approved and enforced by a long line of decisions of the courts, strengthened by the express recognition of the constitution, located land certificates, since the act of 1852, became detached unless they were surveyed, and the field notes were returned to the general land office, as directed by that act.

"It is as necessary for a party who claims land through the location of a certificate to show compliance with that act as it is for him to prove the location itself. The act contains no exceptions, and none can be ingrafted upon it. It applies to all certificates, and all surveys. The legislature was not bound to relieve from its provisions infants or married women, guardians, or administrators, and it did not do so."

It is evident from the findings of fact by the Court of Civil Appeals, which we have heretofore quoted, that its judgment reversing the judgment of the district court and rendering judgment for the defendants in error is based either upon the conclusion that the ancestor for the defendants in error acquired a vested right in the land covered by the location of the certificate on January 8, 1863, the field notes of which were returned to the general land office on January 20, 1864, or that the ancestor of the defendants in error at some other date thereafter acquired such vested right in the land by virtue of some act of the Legislature, or the declaration in regard to valid land certificates passed January 11, 1869, under the head of "Ordinances passed by the Constitution of 1869."

■ It appears also that the Court of Civil Appeals must have concluded that article 10, § 2, of the Constitution of 1869, as well as article 16, § 18, of the Constitution of 1876, which are substantially identical in their purpose, have no application to the facts in this case. The defendants in error contend, among other things, that the Act of February 10, 1852, had been repealed by the Act of December 14, 1863, in so far as the Act of 1852 required the return of the field notes of the survey to the general land office within twelve months after the survey was made. This Act of December 14, 1863 (5 Gammel's Laws, p. 671), is entitled "An act to suspend the location, survey, and sale of the public lands, except in certain cases." The first section suspends all laws authorizing the location, survey, and sale of any of the public lands until six months after the close of the war between the states. In defining the purpose of the Legislature, as expressed in section 1, it is declared by section 2 that the suspension provided for in section 1 was not to "prevent the return of field notes and perfection of title to lands already surveyed." So it appears from the express provision of this act of the Legis-lature that its provisions could not apply to the facts of this case, since the record shows that this land had been surveyed on January 8, 1863, more than eleven months before this act took effect. Moreover, it appears from the caption of the Act of December 14, 1863, that its only purpose was to suspend the location, survey, and sale of the public lands, and could not have had any reference to land which had already been located. This is especially true in view of the express provisions of section 2 of the act, a portion of which we have quoted, and the remainder of which clearly indicates that the purpose of the Legislature is clearly stated in the caption of the act.

■ The defendants in error also make the contention that the Act of November 2, 1866 (Acts 11th Leg. c. 83, p. 81, vol. 5, Gammel's Laws of Texas, p. 999) entitled "An act to extend the time for renewing files of land certificates, making surveys and return of field notes," which, in effect, authorizes all holders of land certificates to renew their files, or make surveys, and to return field notes to the general land office within twelve months from the 1st day of January, 1867, had the retroactive effect to validate the return of the field notes to the general land office after twelve months from the making of this survey, the date of which was January 8, 1863. The defendants in error apparently contend that this Act of November 2, 1866, had also a retroactive effect so as to create a vested right in their ancestor to their land in controversy, notwithstanding his failure to return the field notes to the general land office within twelve months after the survey had been made. The act does not have that effect, nor does it purport to do anything more than to extend the time mentioned in that act within which citizens were entitled to renew files of land certificates, and to make surveys, and to return field notes thereunder. Clearly this act did not affect the status of the claim of the ancestor of the defendants in error to the land in controversy. This is all the more evident because the record shows, beyond dispute, that this ancestor of the defendants in error did not renew his file of the land certificate, nor did he make any survey of any land by virtue of it, nor did he return any field notes of any survey which he may have made within the time prescribed by that act. In other words, neither the act of 1863 nor that of 1866 was in the nature of a curative act. To the extent mentioned in each, it did have the effect to suspend the law in effect relating to the lands mentioned therein. It is a matter of history that, from the time Texas became a member of the Confederate States of America, until the Confederacy collapsed, the energies of the people of the state were almost wholly directed towards the support of the state troops in the service of the Confederate States. Those of us who remem-

ber that tragic era vividly recall the fact that, during the four years in which the state was engaged in the support of the Confederate States, there was maintained only a shell of civil government, and the lawmaking power, recognizing this fact, evidently intended that the status quo of its citizens, with reference to civil contracts, and especially with reference to claims of the unappropriated public domain, as those claims existed from the 2d day of March, 1861, should be maintained. The act of 1863, as well as that of 1866, indicates such to have been the public policy of the state. The record discloses without dispute that neither the ancestor of the defendants in error, nor those having an interest in the Brownrigg certificate, did anything with reference to this certificate, as applicable to the land in controversy, after the field notes of the survey made on January 8, 1863, had been returned to the general land office on January 20, 1864. Clearly it was the policy of the state during this period to prevent any one from acquiring any right to any of the public domain of this state which had not become a vested one, while substantially all of its citizens were engaged in the patriotic public business of maintaining the integrity of the Confederate States of America, and necessarily were compelled to neglect their private business.

The Eighth Legislature adjourned previous to the enactment of the Ordinance of Secession, and the act of 1863 was passed by the Tenth Legislature, which convened after the state had become a member of the Confederate States, and evidently this was the first opportunity the Legislature of Texas had, after becoming a member of the Confederate States, to indicate the public policy of the states with reference to the claims of citizens to appropriate a part of the public domain.

■ Article 7, § 20, of the Constitution of 1845, article 7, § 20, of the Constitution of 1861, and article 7, § 20, of the Constitution of 1866, are substantially the same, in import, as article 10, § 2, of the Constitution of 1869, and article 16, § 18, of the Constitution of 1876. From these provisions of the various Constitutions, it is apparent that it has been the policy of this state, from the beginning of its existence as a sovereign state, including the Republic of Texas, to protect the rights of property, and of action, which had been acquired under the Constitution and the laws of the Republic and of the state, as well as to declare that any rights or actions which had been declared null and void by the Constitution should not be reinvested, renewed, or reinstated either by the Constitution, or by any act of the Legislature or by any other authority known to our form of government.

It is apparent from the record in this case that the land in controversy remained a part of the unappropriated domain of the state,

and subject to appropriation by any one having the lawful right to acquire any of the public domain, merely by pursuing the legal processes open to every citizen, until the state saw fit to dispose of its part of its domain to the holders of the Higginbotham certificate, for the use of the public school fund, and to issue a patent therefor on November 19, 1910, to the assignees of the original owner of this certificate. Assuming, as we do, that the field notes of the original survey made on January 8, 1863, by virtue of the Brownrigg certificate, were correct, and further assuming, as we do, that it was the policy of the state to maintain the status quo of such claims during the continuation of the war between the states, and for some time thereafter, and recognizing the validity of certain acts of the Legislature giving preference to certain persons. by virtue of their previous actions to acquire for themselves a complete title to certain lands attempted to be appropriated out of the unappropriated public domain, it is evident that the ancestor of the defendants in error, during his lifetime, or his legal representatives after his death, might have, by virtue of this public policy, asserted a preferential right to appropriate this land, but the record discloses the fact that nothing was ever done, either by the ancestor of the defendants in error, or by any one succeeding him, to assert any claim to this land beyond having had it surveyed on January 8, 1863, and having the field notes returned to the general land office on January 20, 1864.

■ So we conclude that the contention of the defendants in error, that it was not the intention of the Constitutional Convention of 1869 to invalidate any certificate issued during the war between the states, subsequent to 1861, cannot be sustained, but must be held to be unfounded by reason of the matters heretofore stated. The Act of the Constitutional Convention of 1869, passed January 11, 1869 (6 Gammel's Laws, p. 85), under the head of "Ordinances passed by the Constitutional Convention," and denominated a "Declaration in regard to land certificates," merely declares that no one's lawful right to any part of any public domain should be declared to be forfeited by reason of their failure to have located or surveyed any lands since the 2d day of March, 1861, until three months after the adjournment of the next Legislature. In other words, this act of the Convention merely declares that no citizen's right to any part of the unappropriated domain shall be forfeited by reason of the failure of the citizen to comply with any law passed since the 2d day of March, 1861, which is the date when the state formally passed the ordinance of secession from the Union of the United States. We therefore conclude that this ordinance could not be applied to the facts of this case, as no one has attempted

to forfeit the rights of the defendants in error, or those of their ancestor, to the land in controversy at any time before three months after the adjournment of the Legislature, which convened in 1870.

■ The defendants in error also contend that the Act of April 25, 1871 (6 Gammel's Laws, p. 962), had the legal effect of making a gift of this land to their ancestor, notwithstanding this ancestor had not complied with the laws governing him in his attempted appropriation of it, by reason of the fact that he owned an interest in the Brownrigg certificate. We cannot agree to this contention, even though we should concede that the purpose of the Act of April 25, 1871, was to cure the defects in the claim of their ancestor to this land, for the reason that the provisions of section 2, article 10 of the Constitution of 1869, absolutely prohibited the Legislature from making any such gift, or of reinstating any such claim, or vesting with the title any citizen whose right to a part of the public unappropriated domain has not been already established and vested.

■ On June 2, 1873, the Thirteenth Legislature passed an act which took effect from its passage, which is entitled "An Act to better protect the papers, records and files in the General Land Office." Paschal's Annotated Digest, vol. 2, 5th Ed., art. 7099oo, being the fifth section of said act. This section reads as follows: "When the Commissioner cancels the patent, or permits the floating of a certificate, he shall not deliver the original certificate, but it shall remain in its original file, but shall give the interested party a copy of the original, under his hand and seal of office, in his certificate, in which he shall state that the original patent has been canceled, or the certificate floated, as the case may be, stating the county where the land is situated, covered by said canceled patent or floated certificate, and that the copy is given in lieu of the original, but without any prejudice to the rights of any person by virtue of such patent or certificate."

The record in this case shows that the commissioner of the general land office, in permitting the floating of the Brownrigg certificate, acted strictly according to the provisions of this section of the law of the Act of June 2, 1873, the date of the certificate of the commissioner of the general land office, being subsequent to the passage of the act which permitted the floating of the Brownrigg certificate, for the alleged reason given that the five surveys located in Liberty and Orange counties, made by virtue of the Brownrigg certificate, the field notes of which had been returned to the office and had been found to have been in conflict with other surveys. We merely call attention to this part of the record in this case to show that the commissioner of the general land office acted in this case by virtue of the provisions of the Act of June 2, 1873. We do not pass upon the validity of this act of the commissioner of the general land office, because the view we take of the law of this case does not require us to do so, under its facts. We think the question of its validity or invalidity is not involved. The Brownrigg certificate was in fact floated in an apparently valid manner according to the recitations in this certificate of the commissioner. and at a date while Charles Baldwin was living, his death having been definitely established to have occurred on February 18, 1874. As we have seen, a land certificate is personal property, and if this portion of the certificate, which had been used for a location upon unappropriated public domain of the land in controversy had not lost its personal characteristics, that is to say, had not been merged into the land, then, since the record shows that the Brownrigg certificate had been delivered by the commissioner of the general land office to Wm. F. Clark, who purported to act as attorney in fact for Charles Baldwin and E. E. Chubbuck in securing the manual possession of the certificate, it must be presumed that the commissioner of the general land office had in his possession evidence sufficient to authorize him to do as he did, and that Wm. F. Clark had the lawful right to demand of and receive from the commissioner of the general land office a copy of the original certificate for the purpose of floating the Brownrigg certificate from its original locations upon the five tracts of land located in Orange and Liberty counties, one of which being the land in controversy. This view of the power of the commissioner to pass upon the authority of the person claiming to be the agent of the owner of the certificate sought to be floated is sustained by the provisions of the Act of November 29, 1871 (Acts 1871, 2d Sess., c. 57), entitled "An Act Supplemental to an Act in Relation to the Location, Survey and Return of Genuine Land Certificates, passed April 25, 1871," wherein it is provided that "when a certificate had been located in part, and returned to the General Land Office, the parties owning or controlling such certificate, may withdraw the same for the purpose of locating the unlocated balance thereof, and it shall be the duty of the General Land Office to endorse on each certificate thus withdrawn the amount of land already located, of which field notes have been returned, and are on file in the General Land Office, and such withdrawal shall not in any manner impair the validity of the location." The word "controlling" clearly indicates that the commissioner of the general land office had the power under the law to determine from the evidence presented to him to whom he could lawfully deliver the copy of the certificate intended to be floated.

784

The first section of the Act of April 25, 1871, entitled "An Act in Reference to the Location, Survey and return of Genuine Land Certificates," declares in effect that no rights held by any individual or corporation, by virtue of a land certificate, shall be considered forfeited by reason of its failure to have been located or surveyed or returned since the 2d of March, 1861, under any laws heretofore passed limiting the time for such location or survey, but further provides that the time should be extended to the 1st day of January, 1875. Evidently it was the purpose of the Legislature, as expressed in section 1 of the Act of April 25, 1871 (article 7088 Paschal's Digest), to vacate and in effect nullify every act of the Legislature passed after the 2d day of March, 1861, which was the date of the ordinance of secession, until the 25th day of February, 1871, which related to the rights of any individual or corporation, owning or controlling a genuine land certificate, and to hold in abeyance the rights of any person or corporation owning or controlling a land certificate during that period. Giving effect to section 2 of this act (article 7089), and applying the law to the undisputed facts, as shown by this record, the conclusion must be inevitably reached, that the nature and characteristics of the Brownrigg certificate, as it existed on the day of its issuance, had not changed, or, in other words, that no part of it had ever been merged into any part of the unappropriated public domain of the state, until some date subsequent to January 6, 1874, and that the owners of said Brownrigg certificate, up to January 6, 1874, had the right, by virtue of said certificate, to appropriate of the unappropriated public domain one league of land, by virtue of its ownership. The record further discloses that some person or persons claiming to have the right to control the Brownrigg certificate had secured from the lawful authority of the state prima facie evidence of the fact that such certificate had been lawfully located upon some part of the unappropriated domain of the state, to the extent of 4,428 acres, its full complement of land, by demanding and receiving a patent therefor. This land so appropriated is located in Brazoria county, and the date of the patent is October 13, 1874. Giving the construction which we have to the characteristics of the Brownrigg certificate, in holding that no part of it had been merged into the land upon which it was attempted to be located on January 8, 1863, at the time the Act of February 25, 1871, was passed, and being mindful of the provisions of section 2 of article 10 of the Constitution of 1869, and construing section 2 of said act so as to uphold said section as valid, which we must do, if it can be done, we think the language of the Supreme Court used in Adams v. Railway Co., 70 Tex. 252, 7 S. W. 729, 739, that "the act could legally have application to surveys made before the adoption of that constitution, and not forfeited by it, but returned subsequently to its adoption," as well as to the other language used by the court in its opinion in that case heretofore quoted, to the effect that the purpose of said act was to preserve rights which were, or might have been legally acquired under the laws regulating the locations, surveys, and returns under valid land certificates, we are of the opinion that this point must be ruled by what was said in Jones v. Lee, 86 Tex. 35, 22 S. W. 386, 1092, heretofore quoted in this opinion. The two sections of the Act of April 25, 1871, must be so construed as that they shall harmonize, and, by giving the construction which we have to section 2, such harmony is preserved. Gallup v. Thacker, 103 Tex. 310, 126 S. W. 1120. In the case last cited the surveyor of San Augustine county surveyed the land for Thacker by virtue of an application under the Homestead Donation Act of August 12, 1870 (Acts 12th Leg. Called Sess., c. 53), and also by virtue of Thacker's affidavit showing that he was entitled to have the land surveyed under said Homestead Donation Act. These field notes were duly filed and recorded in the surveyor's office in San Augustine county. Thacker settled upon the land, built a house thereon, and resided upon and occupied it continuously for more than three years, making the same his home. After the expiration of three years, Thacker moved off the land, and remained away from it twelve years, and during the time he was away no one lived upon it, but after his return Thacker made proof of occupancy, and filed same in the General Land Office. This land was delineated and platted on the map of San Augustine county in the name of H. G. Thacker, and remained thereon until supplanted by the survey made by S. W. Blount, Sr., containing 140 acres, which included the Thacker survey of 80 acres. While Thacker was away, and some six years after he had left, S. W. Blount, Sr., by virtue of the Act of July 14, 1879, known as the Scrap Act Law (9 Gammel's Laws, p. 80), had this 140-acre survey made, and purchased it, and a patent was duly issued to him on September 9, 1882. The Supreme Court, in answering a certified question, whether the facts stated sustained the judgment of the trial court, which was in favor of Thacker, answered that they did not, and held that Thacker, by his failure to comply with all the provisions of the law under which he sought to obtain title to the land, had not become vested with any right thereto, so as to preclude the state from selling it to Blount as a part of the unappropriated public domain of the state. Had Thacker filed with the commissioner of the land office proof of his occupancy and deposited with it all lawful fees prior to the offer which Blount made to buy the land from the state, the rights of Thacker to the land covered by his

field notes would have become vested in him and divested out of the state.

We think the principles of law enunciated in the case last mentioned are applicable to the case at bar, and that the state was authorized to issue its patent by virtue of the location of this land under the Higginbotham certificate at the time it did, and that this patent is a complete protection to the title held by the plaintiffs in error against the demands of the defendants in error. The facts in this case are without dispute that the commissioner of the general land office, acting as he did, when this law was in force, on January 6, 1874, when he permitted the Brownrigg certificate to be floated from the land in controversy, did not construe section 2 as having any application to the facts upon which he acted when he permitted the floating of the Brownrigg certificate. To give section 2 the meaning for which the defendants in error contend, would be to nullify article 10, § 2 of the Constitution of 1869, while to give it the construction which we have given it, would not be violating this provision of that Constitution. It is a familiar rule of construction that in construing acts of the Legislature, that construction should be given them which would uphold their validity, and no act of the Legislature is valid which contravenes the Constitution of the state then in force.

The Supreme Court of this state, in a very elaborate opinion written by Chief Justice Stayton (Adams v. Railway Co., 70 Tex. 252, 7 S. W. 729, 739), discussed the Act of April 25, 1871, and stated in effect that this act could legally have application to surveys made before the adoption of the Constitution of 1869, and not forfeited by it, but returned subsequent to its adoption, but not within the time prescribed by the Act of February 10, 1852, and not applicable to cases covered by the Acts of December 14, 1863, and November 2, 1866, as well as surveys made after the adoption of the Constitution of 1869, and the passage of the Act of April 25, 1871. Among other things, Judge Stayton, in speaking of the Act of April 25, 1871, said: "The title of the act, as well as its body, shows that its purpose and spirit was to preserve rights which were, or might have been, legally acquired under laws regulating the locations, surveys, and returns under valid land certificates; but there is nothing in it that evidences an intention to validate a location, survey or return, which would not have been valid, under such laws, if done within the time and in the manner provided by them."

So, under the facts in this case, giving the construction to the Act of April 25, 1871, given by the Supreme Court, in Adams v. Railway, supra, we find that construction to be in harmony with what the Supreme Court said in Jones v. Lee, 86 Tex. at page 35, 22 S. W. 386, 1092, wherein it construed the Act of February 10, 1852, which the defendants in error contend had been repealed by subsequent acts of the Legislature heretofore discussed, and we conclude that under the facts in this case, while the defendants in error may have had an inchoate right to perfect the location made on January 8, 1863, and therefore may have secured an absolute ownership of the land in controversy, by refiling a copy of the survey originally made and by making a demand for a patent, and by showing that the land had been correctly surveyed, yet the record further shows that these things were not done, but, on the contrary, a demand was made by a person having the apparent authority to make it to float the Brownrigg certificate from its location on this land, and that compliance was had with this demand, which was followed up by a location of this certificate upon other lands, which location was followed by issuance of a patent thereon.

While the record in this case does not furnish any affirmative evidence on the subject, being entirely silent, it is reasonable to presume that the commissioner of the general land office did find, on January 6, 1874, that there was a conflict between some of the locations made by virtue of the Brownrigg certificate with previous valid surveys, and that, as he construed the law, he was authorized and required by it to permit the floating of the entire Brownrigg certificate from the five locations which had previously been made on a part of the unappropriated public domain thereon in Orange and Liberty counties, including the land in controversy, and that, so construing the law, he did permit the entire Brownrigg certificate to be floated. Assuming, as we do from the facts in this case, that there was no conflict with any previous surveys with the location of the Brownrigg certificate in Orange county covering the land in controversy, and even conceding that the location made on January 8, 1863, to have been an absolute nullity under section 2 of article 10, of the Constitution of 1869, we are of the opinion that had the owners of the Brownrigg certificate, after the adoption of the Constitution of 1869, refiled with the commissioner of the general land office correct field notes of the survey made originally on January 8, 1863, and had these owners demanded a patent to the land in controversy thus surveyed by virtue of the Brownrigg certificate, and had the commissioner of the general land office refused to issue a patent thereof, in view of the fact that the land was still unappropriated, except by virtue of this location, the commissioner of the general land office would have

been authorized and required to have complied with this demand and issued the patent. But the owners of the Brownrigg certificate did not refile the field notes of said survey, and did not make any such demand, having apparently elected to treat the attempted location made on January 8, 1863, as an invalid one, and also having apparently convinced the commissioner of the general land office that this part of the certificate had not been merged into this land, and that they were the owners of the certificate, and as such owners had the right on January 6, 1874, to float the entire certificate, and to appropriate a part of the unappropriated public domain to the extent of the full complement of the certificates.

The Court of Civil Appeals finds as a fact that the defendants in error, nor their ancestor, from the 20th day of January, 1864, to some date after the 1st day of January, 1916 (the exact date is not disclosed by the record), in that year did not, at any time or in any way, assert any claim to this land or exercise any domain whatever over it, and that their nonclaim, until shortly before this suit was filed, was as complete as if they had no interest therein. In the meantime the maps of Orange county, on file in the General Land Office, also apparently portrayed this land as vacant unappropriated public land, and the authorities of the state so treated it, and recognized the right of the owners of the Higginbotham certificate, under which the plaintiffs in error claim, to appropriate it for the benefit of the school fund by virtue of that certificate, this recognition being followed up after the location of the certificate, on April 10, 1884, by the issuance of a patent on November 19, 1910.

The Court of Civil Appeals apparently reached the conclusion that the owners of the Brownrigg certificate had, under the law and the facts in this case, become vested with the right to appropriate the land in controversy, and that this land had become segregated from the unappropriated public domain of the state, and having reached the conclusion, it very properly reversed the judgment of the trial court. However, as has been demonstrated, this conclusion of the Court of Civil Appeals was an erroneous one. We therefore recommend that the judgment of the Court of Civil Appeals be reversed, and that the judgment of the district court be affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.